1    Mark A. Nadeau (AZ Bar No. 011280)
     mark.nadeau@dlapiper.com
2    Laura M. Kam (AZ Bar No. 025918)
     laura.kam@dlapiper.com
3    DLA PIPER LLP (US)
     2525 East Camelback Road, Suite 1000
4    Phoenix, AZ  85016-4232
     Tel:  480.606.5100
5    Fax:  480.606.5101

6    Attorneys for Plaintiff
     Vantage Mobility International, LLC
7

8                    UNITED STATES DISTRICT COURT

9                        DISTRICT OF ARIZONA

10

11   VANTAGE MOBILITY
     INTERNATIONAL, LLC, an Arizona        Civil Action No.
12   limited liability company,
                                           (Sherman Act and Clayton Act Antitrust
13             Plaintiff,                   Violations, Lanham Act Unfair
                                            Competition, Arizona Uniform State
14        v.                                Antitrust Act Violations, Tortious
                                            Interference with Contractual and Business
15   THE BRAUN CORPORATION, an             Relationships)
     Indiana corporation, doing business in
16   Arizona under the fictitious name THE
     BRAUN CORPORATION OF                  **COMPLAINT AND DEMAND FOR**
17   INDIANA,                              **JURY TRIAL**

18             Defendant.

19

20                     **NATURE OF THE ACTION**

21        1.    This is an action brought by Plaintiff Vantage Mobility International, LLC

22   ("Plaintiff" or "VMI"), which is a developer, manufacturer, and seller of wheelchair

23   accessible and/or occupied, lowered-floor minivan conversions in the United States and

24   Canada, against Defendant The Braun Corporation ("Defendant" or "Braun"), the largest

25   and dominant supplier of competitive product in the aforementioned market.  Defendant

26   Braun has violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 3 of

27

28

the Clayton Act, 15 U.S.C. §14, Section 43(a) of the Lanham Act, 15 U.S.C. §1125, the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1402 and 44-1403, and the common law, by engaging in anticompetitive, unfair, exclusionary, and deceptive conduct – through which Braun has stifled, and endeavored ultimately to foreclose altogether, VMI's ability to compete in the relevant market.

2.      This case involves a scheme by Braun to monopolize the sale of minivans that have been specially converted for access by wheelchair-bound drivers and passengers in the American and Canadian market.  Braun dominates this market.  This month, at Braun's 2010 Dealer Conference in Las Vegas, Braun President Nick Gutwein proclaimed in his keynote address that Braun's share in the American and Canadian market is at least 65%.  Braun's share exceeds that of its nearest competitor, VMI, by nearly three-to-one. Faced with an emerging competitive threat from VMI, and, in particular, with the success of VMI's Honda Odyssey conversion, Braun embarked on an unlawful scheme to drive VMI out of the market.  The scheme continues to this day and, if not stopped, will prevent effective competition, increase prices, and eliminate choice for the wheelchair-bound consumer who is reliant on the conversions for independence and mobility.

3.      VMI seeks injunctive relief and to recover damages, including treble and punitive damages.

### PARTIES

4.      VMI is a limited liability company organized under the laws of the State of Arizona, with its principal place of business located at 5202 S. 28th Place, Phoenix, Arizona 85040.  VMI is engaged in the development, manufacture, and sale of wheelchair

1
2
3

accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada.

4
5
6
7
8
9
10

5.      Defendant Braun is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business located at 631 West 11th Street, Winamac, Indiana 46996.  Braun is engaged in the development, manufacture, and sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada.  Braun is the largest and dominant supplier of this product in the American and Canadian market.

11

## JURISDICTION AND VENUE

12
13
14
15
16
17

6.      Jurisdiction over VMI's claims under the Sherman Act, the Clayton Act, and the Lanham Act is proper under 28 U.S.C. §§ 1331 and 1337(a).  Jurisdiction over the Sherman Act and Clayton Act claims is also proper under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.  Jurisdiction over VMI's state law claims is proper under 28 U.S.C. § 1367(a) and principles of supplemental jurisdiction.

18
19
20
21

7.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 in that this is an action between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

22
23
24
25
26
27
28

8.      Personal jurisdiction over Defendant Braun is proper because Braun conducts substantial business, including sales, in this State, has employees in this State, maintains a training and distribution facility in Mesa, Arizona, and has been authorized to conduct business in this State since at least March 1, 2010.  In addition, the exercise of specific personal jurisdiction is proper because the intended effects of Braun's conduct

DLA PIPER LLP (US)
PHOENIX

were expressly directed at VMI, an Arizona limited liability company which maintains its place of business in this State, and, in fact, caused harm (as Braun intended) to VMI in this State.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, 15 U.S.C. § 15, and/or 15 U.S.C. § 22.  Defendant Braun transacts sales and maintains a training and distribution center in this District.  Also, a substantial part of the events giving rise to the claims were intended to, and did, cause effects in this District.

## THE RELEVANT MARKET

10.      The relevant market for purposes of this action is wheelchair accessible and/or occupied, lowered-floor minivan conversions with ramp or lift access in the United States of America ("United States") and Canada ("The Market").

11.      Wheelchair accessible and/or occupied, lowered-floor minivan conversions enable wheelchair-bound individuals to access and utilize minivan transport, either as a passenger or driver.  Wheelchair-bound individuals cannot access non-converted minivans because the floor of the minivan is elevated from street level, there is insufficient clearance between the floor of the minivan and the roof to permit a wheelchair-bound individual to remain in his wheelchair once in the minivan, and there is insufficient space to house, and no way to secure, the wheelchair once it is in the minivan.  Converters such as Braun and VMI cut the original equipment floor out of a third-party manufactured minivan, which generally requires, among other things, moving and reinstalling the original equipment gas tank.  Converters then reinstall a lowered floor that will accommodate the height of an occupied wheelchair.  Converters also install an automated

deploying ramp or lift that enables wheelchair ingress and egress from the vehicle. Finally, converters remove original equipment seating and install restraints to enable a wheelchair-bound individual to safely drive, or ride as a passenger, in the minivan while still in a wheelchair.  Wheelchair-bound individuals also have the option to transfer from their wheelchairs  to specially-modified "transfer seats" once in the minivan.  In a very real sense, this work amounts to a custom modification of the minivan in a manufacturing process that occurs daily at the VMI facility in South Phoenix.  In the end, consumers can learn to drive the vehicles or simply use them for transport with a third party operator or use them to transport their own guests as well.  From the standpoint of wheelchair-bound individuals, there is no reasonable substitute for wheelchair accessible and/or occupied, lowered-floor minivan conversions.

12.     There are an estimated three (3) million wheelchair users today in the United States alone.  At least 11,000 new wheelchair accessible and/or occupied, lowered-floor minivan conversions are sold in the United States and Canada each year.  Of those 11,000, approximately 1,800 are "rear entry," providing access through the rear of the vehicle, whereas the majority are "side entry," providing access through the minivan's power sliding side door.  The rear entry and side entry wheelchair accessible and/or occupied, lowered-floor minivan conversions are substitutable in many applications, with the primary differentiator being that the rear-entry vans do not allow the wheelchair-bound individual to access the front of the van and drive.  Accordingly, most wheelchair accessible and/or occupied, lowered-floor minivan converters, including Braun, refer to rear-entry and side-entry as a collective market.  For example, though VMI does not

manufacture rear-entry conversions, it views itself as being in competition with sole rear-entry converters such as ViewPoint and with Braun with respect to all of its conversions. (Though Braun primarily manufactures side-entry conversions, it does manufacture an estimated 300 rear-entry conversions annually.)

13. On information and belief, consumer sales of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada total on the order of $540 million annually. On information and belief, the wholesale market for the sale of lowered-floor conversions of OEM minivans (excluding the cost of the vehicle) in the United States and Canada is approximately $175 million annually. The Market is growing and is expected to continued to grow because, among other things, of the increased life expectancy of the American and Canadian populations.

14. The relevant geographic market is the United States and Canada. Braun and VMI, as well as smaller competitor converters, distribute their minivan conversions in the United States and Canada through a network of independent dealers. A small minority of wheelchair accessible and/or occupied, lowered-floor minivan conversions are sold or resold by the converters directly or by third parties over the Internet. The vast majority of end-users purchase wheelchair accessible and/or occupied, lowered-floor minivan conversions locally from independent dealers. All suppliers of wheelchair accessible and/or occupied, lowered-floor minivan conversions to United States customers (both dealers and end-users) are located either in the United States or in Canada. Specifically, Braun, VMI, El Dorado, ROLLX, Freedom, Viewpoint, and AMS are suppliers located in the United States, and Vanaction is a supplier located in Montreal, Canada.

15.     Braun is the largest supplier of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada.  In 2005, following its acquisition of competitor Independent Mobility Systems, Inc. ("IMS"), Braun became the dominant supplier of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada.  Today, Braun's market share is at least 65%, nearly three times that of closest competitor VMI.  Smaller suppliers include El Dorado, ROLLX, Freedom, Viewpoint, AMS, and Vanaction, none of which has a market share of more than 5%.

16.     On information and belief, there are approximately 200 independent dealers (*i.e.*, not affiliated with a manufacturer of wheelchair accessible and/or occupied, lowered-floor minivan conversions) operating approximately 300 retail locations throughout the United States and Canada who are engaged in the retail sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions to end-users and subsequent servicing of same.  On information and belief, those dealers collectively comprise approximately 85% of total retail sales.  Nearly all of those dealers sell Braun wheelchair accessible and/or occupied, lowered-floor minivan conversions.

17.     By virtue of its size, Braun has substantial market power over the approximately 200 dealers who distribute wheelchair accessible and/or occupied, lowered-floor minivan conversions.  Denial of access to Braun products would cause significant economic loss to any dealer, and the threat of such denial provides Braun with power to significantly control the dealers' actions.

18.     Through the acts discussed more fully below, Braun has established and is

improperly attempting to maintain monopoly power in The Market through exclusionary and anticompetitive practices, including the prosecution of sham patent litigation.

## BRAUN'S EXCLUSIONARY PRACTICES

19.     Braun has not been willing simply to compete with VMI on the relative merits of Braun's and VMI's competitive products.  Instead, beginning in at least 2006, and continuing through today, Braun has engaged in a pernicious and escalating pattern of anticompetitive, unfair, exclusionary, and deceptive practices designed to thwart competition from VMI, to prevent and/or disincentivize dealers from distributing VMI's products, to deprive end user customers of a choice between Braun and VMI products, to foreclose VMI from necessary sources of supply, and to exclude VMI from The Market more generally.

20.     Braun's conduct with respect to dealers is a prominent and immediate example of the pattern of anticompetitive, unfair, exclusionary, and deceptive practices undertaken by Braun with the purpose and effect of acquiring, maintaining, and/or expanding its monopoly in The Market with the stated goal to convert most independent dealers into Braun-only distribution points.

21.     Braun has misused, and continues to misuse, its monopoly position in The Market by offering dealers who carry Braun products substantial, and in some cases below cost, discounts on pricing provided that the dealers agree not to sell or offer, and, in fact, refrain from selling or offering, VMI or other competitor products.

22.     Specifically, beginning in 2008, Braun pressured dealers to enter into "AbilityPlus Mobility Retailer Agreements," which are binding for as long as four (4)

years.  Those agreements provide that Braun may, in its sole discretion, terminate any dealer who "purchase[s] less than 65% of their total annual consumer lowered-floor conversions from Braun."  Because of such agreements, the independent dealers are pressured to preserve Braun's monopoly and market share by ensuring that Braun products total at least 65% of their sales.  Dealers whose sales of VMI or other competitor products total more than 35% of their annual sales face termination and refusal of Braun, The Market's dominant supplier, to supply further product – virtually a death knell given the dynamics of The Market.

23.     Braun threatens and pressures dealers to enter into long-term contracts with binding four (4) year minimum terms in which the dealers agree to sell only Braun products during the term of the contract in exchange for "Platinum Level" year-end rebates totaling an estimated 15% of Braun's average dealer selling price.  To ensure compliance, Braun requires that its contracted dealers provide detailed annual accountings of all competitor product sold and has the contractual ability to conduct random audits.  In so doing, Braun obtains otherwise private information and the competitive details of sales and pricing for each of its competitors.

24.     Faced with the temptation of lucrative rebate offers and threat of termination if Braun sales do not total at least 65% of volume, dealers have accepted Braun's restrictions and agreed to refrain from offering VMI or other competitor products in exchange for the right to continue to offer Braun products and receive year-end rebates from Braun.

25.     In a finite market of approximately 200 independent dealers, the loss of

1
2
3
4
5
6

even a single dealer makes it more difficult for VMI and Braun's other smaller competitors to sell sufficient volume to sustain their presence in The Market.  Even worse, the long-term nature of Braun's binding rebate agreements, which range from three (3) to four (4) years, precludes VMI from competing for the relevant dealers' business for years at a time.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

26.     Over the last two (2) years, since the "AbilityPlus" program's inception, Braun has increasingly converted more and more independent dealers who once carried competitor products into effective "Braun exclusive dealerships" through the Platinum program.  For example, Carolina Mobility, a dealership in Charlotte, North Carolina, was one of VMI's top dealers in 2008.  Despite having previously touted the benefits of consumer choice, that dealership contracted to become a Braun "Gold" level dealer in late 2008 and was required to have Braun sales total at least 90% of the dealership's volume.  VMI's sales volume at that dealer consequently dropped dramatically.  By 2010, VMI's sales at Carolina Mobility were down in excess of 85% from 2008 levels.  On information and belief, Carolina Mobility's agreement with Braun is at least four (4) years in duration and VMI cannot "bid" to return to its former volume levels at Carolina Mobility until late 2012.  More recently, in September 2010, MC Mobility Systems, Inc. of Ohio, one of the top dealers of VMI wheelchair accessible and/or occupied, lowered-floor minivan conversions for more than ten (10) years, informed VMI of its decision to become a Braun exclusive or "Platinum" level dealership.

26
27
28

27.     In June 2009, Braun distributed data on its AbilityPlus dealer commitments to a number of its dealers.  According to the data Braun distributed at that time, Braun

had:

- sixty-three (63) dealer locations enrolled in the "Platinum" program requiring a four (4) year agreement that those locations "purchase 100% of their total annual consumer lowered-floor conversions from Braun;"

- eighty (80) dealer locations enrolled in the "Gold" program requiring a four (4) year agreement that those locations "purchase at least 90% of their total annual consumer lowered-floor conversions from Braun;" and

- sixty-five (65) dealer locations enrolled in the "Silver" program requiring a (3) year agreement that those locations "purchase at least 65% of their total annual consumer lowered-floor conversions from Braun."

Accordingly, as of June 2009, Braun had 208 of the estimated 300 dealer locations in the Market or 70% of the Market tied up in long-term contracts either committing all or the vast majority of their market share to Braun.  On information and belief, Braun has increased the number of dealers enrolled in the AbilityPlus program in the year and a half since those numbers were published, and Braun may now effectively control as much as 75% of the Market.

28.   Braun has also entered into exclusive agreements with OEM minivan manufacturers and their Tier 1 suppliers in furtherance of its monopolization scheme.  For example, Chrysler requested, in conjunction with its 2008 RT minivan platform launch, that all conversion equipment upfitters work with Chrysler's Tier 1 electrical engineering designer DGE Inc. ("DGE") to utilize a Chrysler-approved electronic gateway for communication between the RT chassis and any conversion equipment (here

communication between the power sliding side-entry door and the converters' power wheelchair access ramps).  On August 16, 2006, when various wheelchair accessible and/or occupied, lowered-floor minivan converters were gathered in Michigan and were scheduled to meet with DGE on collective development of such a gateway module, Braun preemptively announced that it had entered into an exclusive agreement with DGE to develop a Wheelchair Ramp Gateway Module ("WRGM") for the RT platform.  Braun then pressured its competitor converters to purchase the WRGM  solution by threatening that Chrysler would not support OEM equipment warranties on conversions that did not access the DGE gateway through WRGM.  Because of Braun's exclusive agreement, VMI and the other competitor converters were foreclosed from the opportunity to work with DGE.  In order to avoid paying Braun the excessive WRGM royalty fee it demanded, VMI was forced to develop its own gateway module at a far greater cost than would have been incurred had the converters collectively developed a gateway solution with DGE as Chrysler requested.

29.     In addition to the DGE exclusive, Braun has attacked, and attempted to foreclose, other VMI supply sources.  Specifically, Braun has entered into yet another long-term exclusive agreement, and has indefinitely tied-up, the only remaining national supplier of dealer financing.  As is the case in the automobile industry generally, dealers who distribute wheelchair accessible and/or occupied, lowered-floor minivan conversions do not have the out-of-pocket funds to pay for pre-sale inventory.  Accordingly, to be commercially viable, any wheelchair accessible and/or occupied, lowered-floor minivan converter must be able to furnish a source of "floorplan financing" to the independent

dealer network to allow dealers to finance inventory pending its sale. Following the exit of Textron Financial Corporation from the commercial finance business in late 2008, GE Capital is now, to VMI's knowledge, the only national source of such dealer floorplan financing for the relevant products.

30.     VMI has repeatedly approached GE Capital seeking floorplan financing for its product. On each occasion, VMI has been told there is no room at the proverbial inn and that GE Capital cannot provide financing to VMI because GE Capital is bound by an exclusive agreement with Braun for the wheelchair accessible and/or occupied, lowered-floor minivan conversion market. When VMI has inquired about the duration of the agreement and its ability to seek financing in the future, VMI has been told that the agreement is long-term and of an indefinite nature. In addition, VMI recently learned that Braun's agreement with GE Capital purportedly contains an explicit blacklist provision prohibiting GE Capital from furnishing any floorplan financing to VMI.

31.     Braun's exclusive agreement with GE Capital, and the attendant, explicit blacklisting of VMI, has indefinitely foreclosed VMI from what is, to VMI's knowledge, the only remaining national source of floorplan financing for the Market. VMI has been forced to scramble to seek financing from individual automobile dealers at an increased cost per minivan conversion of approximately $1,000 over financing previously offered by Textron Financial Corporation and other now-defunct national floorplan financiers. In order to retain business at the remaining non-Braun exclusive dealers, VMI has been forced to "eat" the increased financing cost as dealers refuse to pay more for floorplan financing than they have to pay through the Braun/GE Capital arrangement. Such

increased cost absorption, coupled with lost volume due to Braun's long-term exclusionary tie-ups of the dealers, is slowly driving Braun's competitors out of The Market, participation in which as a product supplier will shortly not be economically sustainable for anyone but Braun.

32.     In support of this predation, Braun has offered bonuses or rebates at below-cost levels in order to convert VMI customers to Braun-exclusive dealerships.  For example, on information and belief, in 2007, Braun offered Ride-Away, the largest chain of independent dealers operating thirteen (13) locations, a bonus of approximately $8,000 dollars per incremental unit sold to replace all former VMI sales at Ride-Away dealerships with Braun sales.  On information and belief, those $8,000 dollar per unit rebates were below Braun's cost and were predatory.  In 2006, Ride-Away was VMI's top dealership.  By 2008, as a result of Braun's predation, Ride-Away's sales of VMI wheelchair accessible and/or occupied, lowered-floor minivan conversions had fallen an astonishing 97%.

33.     Similarly, in 2008, VMI secured an oral commitment from a previously Braun-only dealership, Ilderton Conversions in Charlotte, North Carolina ("Ilderton"), to begin distribution of VMI wheelchair accessible and/or occupied, lowered-floor minivan conversions.  Within two (2) weeks of the oral commitment, Ilderton reversed course citing its decision to remain a Braun exclusive dealership.  On information and belief, Braun offered Ilderton, at a minimum, platinum-level rebate incentives to remain a Braun exclusive dealership and to refuse to carry VMI product.

34.     On information and belief, the purpose and effect of Braun's predatory,

below-cost pricing practices is to eliminate all effective competition from the Market, with the objective of recouping short-term losses by raising prices back up to supra-competitive levels later, when VMI and other competitors have been put out of business.

35.     Through the above exclusionary agreements and anticompetitive practices, Braun has sought to deprive dealers of the freedom to make competitive choices about which products should be offered to their end user consumers and the ability to diversify their products to best serve end user consumers' needs.

36.     On information and belief, Braun has entered, or attempted to enter, into such exclusionary agreements with virtually all of the dealers who carry and have carried Braun's products.  These agreements have effectively foreclosed VMI's products from a very substantial portion of the Market, severely impairing VMI's good faith attempts to compete in The Market.

37.     Collectively, Braun's anticompetitive practices have unreasonably restrained, and, unless enjoined by this Court, will continue to unreasonably restrain, competition in The Market.  There are no legitimate or pro-competitive business justifications for Braun's practices.  To the contrary, Braun's acts artificially increase its share in The Market and "tip" it permanently to Braun because of its illegal exercise of monopoly power.

38.     Braun's attitude toward competition was recently summarized by its Founder and Chief Executive Officer, Ralph W. Braun, who in his 2010 autobiography entitled "Rise Above" stated[1] that "[i]f any of my competitors were drowning, I'd stick a

---

[1] With attribution as set forth on the page identified.

hose in their mouth and turn on the water." *See* RALPH W. BRAUN, RISE ABOVE 158 (The Braun Corporation 2010) (2010).  As Mr. Braun further stated:  "I accept competition as a fact of life . . . but I don't have to like it." *Id.*

39.     Neither the antitrust laws nor this action inhibit or seek to inhibit Braun from competing on the merits with VMI by innovation or otherwise.  Rather, this Complaint challenges Braun's concerted attempts to acquire, maintain, and/or expand an unlawful monopoly through predatory pricing, unfair competition, exclusionary long-term agreements with dealers and with the only remaining national source of floorplan financing, as well as other anticompetitive acts that deter innovation, eliminate competition, exclude competitors, and rob customers of their right to choose among competing alternatives.

40.     Braun's conduct adversely affects innovation by, among other things:

a.   impairing the incentives of VMI and other competitors and potential competitors to undertake research and development on new products, because they know that Braun will be able to limit the rewards to them from any resulting innovation;

b.   inhibiting VMI and other competitors that nevertheless succeed in developing promising innovations from effectively marketing their innovative products to dealers and ultimately to end user customers;

c.   reducing the incentive and ability of dealers to diversify the products they offer in ways that would appeal to end user customers; and

d.   reducing competition and the spur to innovation by VMI that only

competition can provide.

41.     The purposes and effect of Braun's conduct with respect to The Market has been and, if not restrained by this Court, will continue to be:

    a.  to preclude or lessen competition on the merits between the products of Braun and VMI;

    b.  to preclude or lessen potential competition with Braun products from new products to be developed by VMI in the future;

    c.  to enable Braun to acquire, maintain, and/or expand its market share and monopoly power in The Market; and

    d.  to unfairly prejudice consumer choice through artificial manipulation of dealers and manufacturing to the effect that wheelchair-bound potential users of the converted minivans are precluded from legitimate differentiations in price and product.

## BRAUN'S SHAM PATENT LITIGATION

42.     Braun is the assignee of U.S. Patent No. 6,825,628 (hereinafter "the '628 patent") pertaining to the interaction of minivan original equipment side door-closing mechanisms with automated wheelchair access ramps installed by converters of such minivans to allow wheelchair access.  Two (2) of the three (3) individuals named as "inventors" in the patent, Ronald Goodrich and Keith Heigl, were Braun employees. Though provisional and continuation-in-part applications for the '628 patent were filed on September 1, 2000 and May 10, 2002 respectively, the patent did not issue until November 30, 2004, several months after Braun's July 2004 acquisition of IMS.

43.     As part of its unlawful scheme to monopolize the market, Braun filed a baseless patent infringement claim against VMI in 2006 in the United States District Court for the Northern District of Indiana, Hammond Division, alleging that both of VMI's current product offerings – its Chrysler Dodge Caravan and Honda Odyssey conversions – infringed the '628 patent.  Braun knew that, merely by initiating patent litigation against VMI, it would intimidate wheelchair accessible and/or occupied, lowered-floor minivan conversion dealers and discourage them from purchasing VMI's products for resale while the litigation was pending.

44.     Braun's unlawful scheme has worked.  Since the initiation of Braun's lawsuit against VMI, Braun's market share has, according to its own President, steadily increased, cementing Braun's dominant position in The Market.

45.     Faced with these claims of patent infringement, VMI undertook is own investigation and evaluation of Braun's allegations.

46.     VMI discovered that the '628 patent was obtained through fraudulent conduct before the U.S. Patent & Trademark Office ("PTO"), including the intentional withholding of material prior art.  In the absence of such conduct, the '628 patent would not have issued.  Despite knowing that the patent is invalid and unenforceable, Braun has improperly filed and aggressively litigated claims of patent infringement against VMI because it knows that, as long as a patent infringement lawsuit pending, VMI has great difficulty selling its wheelchair accessible and/or occupied, lowered-floor minivan conversions.  To that end, Braun has intentionally drawn out the patent litigation to create confusion and uncertainty in the Market for the longest possible duration.

47.     Braun's scheme has been difficult to detect because of the patent's technical complexity and because patent prosecution is an ex parte process in which over-committed Examiners with little time for independent analysis must rely on the submitting party to comply with federal law requiring complete candor in the disclosure of relevant prior art.

48.     As set forth below, Braun had ample reason to know that the '628 patent asserted against VMI was procured through fraud, and yet Braun deliberately concealed its knowledge that the patent was unenforceable.

49.     Braun knew that its broad claims under the '628 patent were invalid when the patent was filed, throughout its prosecution, and thereafter because prior to the filing of both the provisional and continuation-in-patent applications, IMS, VMI, and another competitor, Ricon Corporation ("Ricon"), all had products on the market embodying the "invention" claimed in the patent.  Specifically, beginning in the fall of 1998 and the spring of 1999, IMS respectively sold Ford and Chrysler "Rampvan" conversions with "one-touch" technology, enabling a single control switch to open the power sliding door and deploy the wheelchair ramp.  The IMS Rampvans contained a "Genesis" controller, which controlled and integrated door and ramp functions to sense obstructions and prevent operational interference between the two systems.  As early as December 6, 2000, VMI sold a Chrysler conversion that included the OEM power door and a VMI-4 electronic controller, which fully integrated control of the door with a VMI powered ramp to prevent operational interference between the two.  As early as 1999, Ricon sold General Motors' ("GM") Activan conversions featured single button integration of the OEM power door

and power ramp, wherein operation of the door was selectively delayed to prevent operational interference between the OEM power door and the ramp.

50.     Braun failed to disclose the IMS, VMI, and Ricon prior art to the PTO, and the Examiner was not aware of, nor did he discover, the IMS, VMI, and Ricon technologies during the prosecution of the '628 patent.

51.     During the prosecution of the '628 patent, Braun was unquestionably aware of the existence of the IMS prior art because nearly two (2) years prior to the filing of the provisional patent application, one of the inventors of the '628 patent, Donald Sturm, conducted extensive testing on the IMS Rampvan technology.  Mr. Sturm met with Braun co-inventor Ronald Goodrich and Braun executive Jeff Hermanson, among others, on January 29, 1999 to discuss his findings.  Though Mr. Strum had in his possession a patent and other printed publications related to the IMS Rampvan Technology, he did not submit those materials to the PTO during the prosecution of the '628 patent, nor did Braun submit any of its own internal reports of Mr. Sturm's testing of the IMS technology to the PTO.  Further, Braun purchased IMS in July 2004 – more than four (4) months prior to the issuance of the '628 patent.  Braun acquired all of IMS' intellectual property in that transaction.  Yet Braun did not submit any IMS patents, patent applications, Rampvan service manuals, or any IMS publications whatsoever (such as IMS sales brochures) during the '628 patent's prosecution.

52.     During the prosecution of the '628 patent, Braun was also aware of the existence of the VMI and Ricon prior art.  On or about January 23, 2002, Braun engaged in a reverse-engineering "dissection" of VMI's Chrysler minivan conversion featuring an

OEM door and a VMI-4 controller.  Similarly, in November 2001, Braun engaged in a reverse-engineering "dissection" of a Ricon Activan.  Braun failed to disclose its reports of the VMI and Ricon dissections to the PTO.

53.     Moreover, well in advance of the '628 patent's issuance, Braun itself had product on the market that embodied the claimed invention.  Specifically, as early as August 1998, Braun offered a Chrysler Entervan conversion that used a relay-based controller to control the operation, and prevent operational interference between, the power door and power ramp.  Braun, failed to disclose the existence of its own prior art technology – which Braun was unquestionably aware of – during the prosecution of the '628 patent.

54.     Braun also failed to disclose to the PTO that numerous elements claimed by the '628 patent in fact originated from prior art patented Chrysler technology.  *See* U.S. Patent No. 6,075,460 entitled "Method of Operating a Power Sliding Door Liftgate Using Remote Keyless Entry System" issued to Chrysler on June 13, 2000.

55.     Because the '628 patent was fraudulently obtained through Braun's intentional failure to disclose material prior art to the PTO, the patent is invalid and unenforceable.

56.     VMI has filed a counterclaim for invalidity in the Northern District of Indiana action and has filed a Motion for Summary Judgment of Patent Invalidity and Unenforceability, which is pending in that matter, and is incorporated herein by reference.

57.     Despite knowledge of the patent's invalidity and unenforceability, Braun has used its patent infringement lawsuit against VMI as a marketing tool.  On information

and belief, Braun has intimidated dealers who distribute VMI's wheelchair accessible and/or occupied, lowered-floor minivan conversions by falsely advising them that VMI's technology infringes Braun's patent.

58.     Upon information and belief, Braun is also using the meritless patent infringement litigation as a tool to depress VMI's market value and force a sale of VMI to Braun at a below-market price by demanding an exorbitant settlement amount or license fee, payment of which would not enable VMI to remain an economically viable competitor. Braun has a history of employing such a strategy. In his autobiography, Ralph Braun describes a parallel situation in which Braun acquired another competitor's (UVL's) patent for a school bus lift and promptly used that patent as leverage to force Braun's acquisition of its then-largest competitor in the school bus lift business, Mobile Tech. *See* RALPH W. BRAUN, RISE ABOVE 166 (The Braun Corporation 2010) (2010). As Mr. Braun himself states "I informed Junior [Mobile Tech's head executive] and Mobile Tech they were infringing on our newly acquired patent and would have to pay us royalties . . . . [Junior] knew he could not afford to make the royalty payments . . . . He was in a jam with no way out. I called Junior and offered him a deal: instead of going into a long and costly legal battle over the patent infringement, I would buy Mobile Tech. . . . Defeated, Junior gritted his teeth and made the deal. After I hung up the phone, I smiled with satisfaction." *Id.*

59.     The purpose and effect of Braun's sham patent infringement suit has been to use the litigation process, as opposed to the outcome of that process, as an anticompetitive weapon to establish and maintain Braun's monopoly power.

60.     Braun's unlawful conduct has injured competition in The Market, hurt customers and consumers, and severely injured VMI's business.  Braun's aggressive use of its invalid patent claims has effectively limited choices available to dealers and wheelchair-bound consumers relying on wheelchair accessible and/or occupied, lowered-floor minivan conversions for mobility.

## ANTITRUST INJURY

61.     Braun's unlawful conduct has injured competition in The Market.  Dealers and wheelchair-bound end-users have been deprived of a free, unfettered competitive market for the purchase of wheelchair accessible and/or occupied, lowered-floor minivan conversions.

62.     VMI is an actual competitor in the relevant market affected by Braun's anticompetitive conduct.  VMI has suffered injury as a result of Braun's predatory and exclusionary conduct, including the loss of actual and potential customers, lost profits, and the loss of business goodwill.  VMI has been deprived of the opportunity to freely compete in the marketplace with Braun as a direct result of Braun's wrongful conduct.

## CLAIMS FOR RELIEF

**A.      First Claim for Relief:  Unlawful Exclusionary Agreements in Violation of Section 1 of the Sherman Act**

63.     Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

64.     There is a relevant market for the sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada, which has been referred to herein as The Market.

65.     Braun's exclusionary agreements with dealers – pursuant to which dealers explicitly agree with Braun and/or are effectively required by Braun not to offer VMI's competing products – unreasonably restrain competition in The Market.  These agreements restrict VMI's access to customers and to an essential channel of distribution to end-users, thereby foreclosing VMI from a substantial portion of The Market and restraining competition in The Market.

66.     Braun's exclusionary agreement with GE Capital, the United States' only remaining national supplier of floorplan financing to The Market, unreasonably restrains competition.  This agreement forecloses VMI's access to an essential source of financing specifically necessary to the distribution of the product at issue, thereby foreclosing VMI's access to a substantial portion of The Market and restraining competition in The Market.

67.     The purpose and effect of these agreements are to unreasonably restrain trade and competition in The Market.  These agreements are contracts, combinations, and/or conspiracies that violate of Section 1 of the Sherman Act, 15 U.S.C. §1.

68.     Braun's conduct has occurred in, and is having a substantial effect on, interstate commerce.

69.     As a direct competitor that was targeted and damaged by Braun's anticompetitive conduct, VMI has suffered antitrust injury and has standing to bring this claim.

70.     VMI is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief under Section 16 of the Clayton Act, 15

U.S.C. § 26.

**B.**     **Second Claim for Relief:  Exclusive Dealing Agreements in Violation  of Section 3 of the Clayton Act**

71.     Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

72.     There is a relevant market for the sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada, which has been referred to herein as The Market.

73.     Braun's agreements with dealers, by which dealers undertake to carry products only from Braun and not from VMI, have lessened, and are likely to continue to lessen, competition substantially in The Market.

74.     Braun's exclusive dealing agreements with dealers tie up a significant portion of The Market, effectively foreclosing VMI from reasonable and fair access to a substantial portion of The Market.

75.     Braun's exclusive dealing agreements with dealers violate Section 3 of the Clayton Act, 15 U.S.C. §14.

76.     Braun's conduct has occurred in, and is having a substantial effect on, interstate commerce.

77.     As a direct competitor that was targeted and damaged by Braun's anticompetitive conduct, VMI has suffered antitrust injury and has standing to bring this claim.

78.     VMI is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

79.     VMI is also entitled to a permanent injunction, under Section 16 of the Clayton Act, 15 U.S.C. § 26, restraining Braun from engaging in the anticompetitive acts. Unless enjoined from continuing its exclusive dealing agreements with dealers, VMI will suffer further and irreparable harm for which there is no adequate remedy at law.

**C.     Third Claim for Relief:  Overall Scheme to Monopolize in Violation of Section 2 of the Sherman Act**

80.     Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

81.     There is a relevant market for the sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada, which has been referred to herein as The Market.

82.     On information and belief, Braun possesses monopoly power in The Market.

83.     Braun has taken affirmative predatory and exclusionary steps to acquire and maintain its monopoly power in The Market.

84.     Through the anticompetitive, unfair, exclusionary, predatory and deceptive conduct described herein, Braun has willfully achieved and maintained, and unless restrained by the Court, will continue to willfully maintain and expand, that monopoly power.

85.     Braun's acts and the continuing course of Braun's anti-competitive conduct have harmed and threaten to continue to harm customers, end-users, and competition in The Market.

86.     Braun's acts, undertaken with the intent to acquire and maintain its monopoly power in The Market, violated and continue to violate Section 2 of the Sherman

Act, 15 U.S.C. §2.

87.     Braun's conduct has occurred in, and is having a substantial effect on, interstate commerce.

88.     As a direct and proximate result of Braun's exclusionary and anticompetitive conduct, VMI has been injured and has sustained substantial damages. VMI will continue to sustain foreseeable damages in the future as a result of Braun's wrongful conduct.  Unless the activities complained of are enjoined, VMI will suffer immediate and irreparable injury for which VMI will have no adequate remedy at law.

89.     As a direct competitor that was targeted by Braun's anticompetitive conduct, VMI has suffered antitrust injury and has standing to bring this claim.

90.     VMI is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  VMI is also entitled, under  Section 16 of the Clayton Act, 15 U.S.C. § 26, to a permanent injunction restraining Braun from engaging in the anticompetitive acts.

**D.      Fourth Claim for Relief:  Overall Scheme of Attempted Monopolization in Violation  of Section 2 of the Sherman Act**

91.     Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

92.     There is a relevant market for the sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada, which has been referred to herein as The Market.

93.     Braun has attempted to monopolize The Market.

94.     Braun has a specific intent to monopolize, and to destroy effective

competition in, The Market.

95.     Braun has willfully and affirmatively engaged in, and is engaging in, a course of exclusionary and predatory conduct, as alleged above, in an attempt to monopolize The Market.

96.     Braun's alleged prior acts and the continuing course of Braun's anti-competitive conduct have harmed and threaten to continue to harm consumers and competition in The Market.

97.     There is a dangerous probability that, unless restrained by this Court, Braun will succeed in acquiring, maintaining, and/or expanding its monopoly power in The Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. §2.

98.     Braun's conduct has occurred in, and is having a substantial effect on, interstate commerce.

99.     As a direct and proximate result of Braun's exclusionary, predatory, and anticompetitive conduct, VMI has been injured and has sustained damages.  VMI will continue to sustain foreseeable damages in the future as a result of result of Braun's exclusionary, predatory, and anticompetitive conduct.  Unless the activities complained of are enjoined, VMI will suffer immediate and irreparable injury for which VMI will have no adequate remedy at law.

100.     As a direct competitor that was targeted by Braun's anticompetitive conduct, VMI has suffered antitrust injury and has standing to bring this claim.

101.     VMI is entitled to recover treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  VMI is also entitled, under  Section 16 of the Clayton Act,

15 U.S.C. § 26, to a permanent injunction restraining Braun from engaging in anticompetitive acts.

E.   **Fifth Claim for Relief:  Sham Litigation to Monopolize in Violation of Section 2 of the Sherman Act**

102.   Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

103.   There is a relevant market for the sale of wheelchair accessible and/or occupied, lowered-floor minivan conversions in the United States and Canada, referred to herein as The Market.

104.   Braun has monopoly power in The Market.

105.   Braun has filed and maintained an objectively baseless lawsuit for patent infringement without any good faith belief that Braun could prevail in the litigation and with the subjective intent of using the litigation process to depress VMI's market share in The Market, force VMI's exit from The Market, and thereby harm competition in The Market.

106.   Braun's sham litigation has occurred in, and is having a substantial effect on, interstate commerce.

107.   Braun's sham litigation has injured and will continue to injure customers, end-users, and competition in The Market.

108.   As a direct and proximate result of Braun's sham litigation, VMI has been injured and has sustained substantial damages, including the loss of customers and the loss of significant goodwill and stature in The Market.  VMI will continue to sustain foreseeable damages in the future.  Unless the activities complained of are enjoined, VMI

will suffer immediate and irreparable injury for which VMI will have no adequate remedy at law.

109.    As a direct competitor that was targeted and damaged by Braun's sham litigation, VMI has suffered antitrust injury and has standing to bring this claim.

110.    VMI is entitled to recover its damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  VMI is also entitled, under  Section 16 of the Clayton Act, 15 U.S.C. § 26, to a permanent injunction restraining Braun from engaging in the sham litigation and related unlawful communications with customers and other participants in The Market.

**F.      Sixth Claim for Relief:  Unfair Competition Under § 43(A) of the Lanham Act**

111.    Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

112.    Braun has made false or misleading statements to the independent dealers who are VMI's customers and to the industry in the relevant market generally concerning the validity, enforceability, breadth, and applicability of its patent relating to wheelchair accessible and/or occupied, lowered-floor minivan conversions.

113.    On information and belief, Braun has made false or misleading statements to VMI's customers and the industry in the relevant market (The Market) generally about the characteristics and qualities of VMI's wheelchair accessible and/or occupied, lowered-floor minivan conversions and the financial stability of VMI.  These statements include Braun's representations that VMI's Chrysler and Honda minivan conversions infringe Braun's existing patent and that VMI is financially unstable and will be unable to fulfill

dealer orders or support existing product.

114.    Braun has used its baseless lawsuit for patent infringement against VMI as a marketing device to mislead VMI's customers and the public about VMI's wheelchair accessible and/or occupied, lowered-floor minivan conversions and to gain a competitive advantage over VMI.

115.    The statements described above, and others made by Braun, have actually deceived or have the tendency to deceive their audience.

116.    The statements described above, and others made by Braun, are material in that they are likely to influence purchasing decisions.

117.    Braun's aforementioned statements have been made in bad faith.

118.    VMI's wheelchair accessible and/or occupied, lowered-floor minivan conversions are sold in interstate commerce.

119.    As a direct and proximate result of Braun's conduct, VMI has suffered, and continues to suffer, actual damages, including in the form of lost prospective and actual business, lost profits, loss of goodwill and damage to its reputation and the reputation of its products, and out-of-pocket and other litigation-related expenses in an amount to be determined at trial.

120.    Unless the activities complained of herein are enjoined, VMI will suffer immediate and irreparable injury for which VMI will have no adequate remedy at law.

1
2

G.    **Seventh Claim for Relief:  Monopolization in Violation of the Arizona Uniform State Antitrust Act**

3
4

121.    Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

5
6
7
8
9

122.    Braun's exclusionary agreements with dealers and with GE Capital are acts to acquire, maintain, and/or expand Braun's monopoly in The Market for the purpose of excluding competition, including competition from VMI, in violation of the Uniform State Antitrust Act, as enacted by the State of Arizona, A.R.S. §§ 44-1402 and 44-1403.

10
11
12
13
14

123.    Braun has reached exclusionary agreements with dealers located in the State of Arizona, including Ability Center.  In addition, Braun's acts of monopolization have been committed willfully and with the intent to injure VMI, an Arizona limited liability company with its principal place of business in Arizona, in the State of Arizona.

15
16
17
18
19
20
21

124.    As a direct and proximate result of Braun's exclusionary and anticompetitive conduct, VMI has been injured and has sustained substantial damages. VMI will continue to sustain foreseeable damages in the future as a result of Braun's wrongful conduct.  Unless the activities complained of are enjoined, VMI will suffer immediate and irreparable injury for which VMI will have no adequate remedy at law.

22
23
24

125.    As a direct competitor that was targeted and damaged by Braun's anticompetitive conduct, VMI has suffered antitrust injury and has standing to bring this claim.

25
26
27
28

126.    VMI is entitled to recover treble damages under A.R.S. § 44-1408(B).  VMI is also entitled, under A.R.S. §44-1408(B), to a permanent injunction restraining Braun from engaging in the anticompetitive acts.

**H.     Eighth Claim for Relief:  Tortious Interference With Contractual and Prospective Business Relationships**

127.    Plaintiff incorporates by reference all of the above allegations as if expressly realleged herein.

128.    VMI has had a reputation for quality and valuable goodwill associated with its development, manufacture, and production of its primary product offering:  a wheelchair accessible and/or occupied, lowered-floor conversion of the Honda Odyssey minivan.  VMI has had a reasonable expectation that wheelchair accessible and/or occupied, lowered-floor minivan conversion dealers would distribute VMI's Honda Odyssey conversion and that existing end-user customers and prospective customers would purchase that product.

129.    On information and belief, until 2010, VMI was the only wheelchair accessible and/or occupied, lowered-floor minivan converter that had supply agreement with American Honda Motor Co., Inc. ("Honda") to directly purchase fleets of Honda Odyssey minivans for lowered-floor / wheelchair accessible and/or occupied conversion.

130.    On information and belief, Braun was aware of, and illegally interfered with, VMI's agreement with Honda through the improper means of intentionally misrepresenting that Braun had valid patent claims and that VMI's wheelchair accessible and/or occupied, lowered-floor Honda Odyssey minivan conversion infringed Braun's patent.

131.    Braun further interfered with VMI's relationship with Honda by naming Honda as a Defendant in Braun's patent infringement suit against VMI.

132.    As a result of Braun's actions, Honda recently informed VMI of its intent to

directly supply Braun with Honda Odyssey minivans.

133.    On information and belief, Honda's supply agreement with Braun is in furtherance of a settlement agreement reached between those entities to dismiss Honda from Braun's infringement lawsuit.  On information and belief, Honda would not have agreed to such a supply agreement with Braun absent Braun's naming of Honda as a Defendant in Braun's baseless infringement lawsuit against VMI.

134.    Braun's intention in suing Honda as a Defendant in Braun's infringement lawsuit against VMI was to force Honda to end its supply agreement with VMI and to enter into a supply agreement with Braun.

135.    These actions of Braun constitute a direct and intentional interference with the business and/or contractual relations between VMI and its chief OEM supplier, Honda.

136.    Braun's institution of the baseless patent litigation, making false and threatening statements, and employing other improper means, all of which were done with knowledge of VMI's contractual and business relationship with Honda and in bad faith, have directly caused injury to VMI's business and property.

137.    As a direct and proximate result of Braun's interference, VMI has suffered and continues to suffer damages, including in the form of lost prospective and existing business in the sale of Honda Odyssey wheelchair accessible and/or occupied, lowered-floor minivan conversions, lost profits and higher risks and expenses in doing business, loss of goodwill and damage to its reputation and the reputation of its products, and out-of-pocket and other litigation-related expenses in an amount to be proven at trial.

138.    Unless the activities complained of are enjoined, VMI will suffer immediate and irreparable injury for which VMI has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.    That the Court enter a judgment finding that:

a.    Braun's agreements to provide dealers with substantial discounts in pricing of Braun products on the condition that such dealers enter into long-term agreements not to sell or offer competitor products violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1 and 2, Section 3 of the Clayton Act, 15 U.S.C. §14, and the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1402.

b.    Braun has attempted to monopolize The Market as defined herein in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1402.

c.    Braun has willfully maintained its monopoly in The Market as defined herein in violation of Section 2 of the Sherman Act, 15 U.S.C. §2, and the Arizona Uniform State Antitrust Act, A.R.S. §§ 44-1403.

d.    Braun's exclusive dealing agreements and arrangements with dealers and suppliers violate Section 3 of the Clayton Act, 15 U.S.C. §14.

e.    Braun has maintained a sham patent litigation for the purpose of furthering and maintaining its monopoly power in The Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

     f.   Braun made false or misleading statements to the independent dealers and to the industry in the relevant market generally concerning the validity, enforceability, breadth, and applicability of its patent and falsely stated that VMI's Chrysler and Honda conversions infringed the patent in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125.

     g.   Braun intentionally interfered with VMI's contractual and prospective business relationship with Honda.

2.    That the judgment entered by the Court order that Braun, its officers, directors, employees, agents, and attorneys, and all persons acting on its behalf or under its direction or control, and all successors thereto, be preliminarily and permanently enjoined from:

     a.   Taking or threatening any action adverse to any dealer or other person or entity in whole or in part as a direct or indirect consequence of such a dealer purchasing or offering for sale any VMI products;

     b.   Requiring, maintaining, or continuing any exclusive dealing agreements with dealers calculated to preclude such dealers from carrying VMI products;

     c.   Requiring, maintaining, or continuing any exclusive dealing agreements with GE Capital calculated to preclude competitor access to a floorplan financing and/or explicitly blacklisting VMI;

     d.   Maintaining or initiating any sham patent litigation against VMI;

     e.   Falsely claiming that VMI's Chrysler and Honda conversions, or any other

VMI products, infringe Braun's '628 patent;

    f.   Tortiously interfering with any VMI contractual or prospective business relationships, including VMI's relationship with Honda.

3.   That the judgment entered by the Court also order that:

    a.   Braun pay VMI compensatory damages in an amount in excess of $100,000, the exact amount to be determined at trial, to compensate VMI for the harm caused by Braun's anticompetitive and tortious acts;

    b.   VMI's damages be trebled pursuant to the federal antitrust laws, the Lanham Act, and the Arizona Uniform State Antitrust Act;

    c.   Braun pay VMI punitive damages in an amount to be determined at trial for Braun's unlawful and malicious conduct, which was intended to harm VMI in the conduct of its business;

    d.   Braun pay VMI's attorneys' fees and costs incurred in connection with this action and defense of Braun's baseless infringement action against VMI; and

    e.   VMI have such other and further relief as the Court deems just and proper, including disgorgement by Braun of all sums it obtained pursuant to the scheme described herein.

DLA Piper LLP (US)
Phoenix

-37-

1

## JURY DEMAND

2

Plaintiff hereby demands a trial by jury for each and every one of the foregoing

3

claims for relief so triable.

4

5                                          Respectfully submitted,

6

Dated:  October 28, 2010                   **DLA PIPER LLP (US)**

7

8                                          By  s/ Laura M. Kam
                                               _____
9                                              Mark A. Nadeau
                                               Laura M. Kam
10
                                               *Attorneys for Plaintiff*
11                                             *Vantage Mobility International, LLC*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28